# CHARLESTON.

## SALISBURY v. BROOKS.

### Submitted October 23, 1917.   Decided October 30, 1917.

1. SALES—*Sales Agency—Construction Contract—"Agency to Sell."*
   A written contract whereby the owner in the opening sentence agrees to "sell" to another "all the lumber to be cut from" a certain tract of timber lands, but the subsequent clauses of which provide that the owner shall furnish a mill and manufacture the lumber and load it on cars "as sales can be made", and that the other party shall advance by monthly payment the estimated manufacturing cost, market the lumber to the best advantage, and account to the owner for the proceeds, less a stated commission to cover interest on such advancements and compensation for his services in effecting sales—properly construed as a whole—creates an agency to sell, and not the relation of vendor and purchaser. (p. 234).

2. CONTRACTS—*Construction by Party—Application of Rule.*
   The rule of practical construction by acts of the parties applies only where the contract on its face is ambiguous and uncertain, and not where by its terms the instrument expresses their intention with reasonable certainty. (p. 237).   :

Error to Circuit Court, Webster County.

Action by E. J. Salisbury against Arthur Brooks. Judgment for plaintiff, and defendant brings error.

*Reversed, and judgment entered for defendant.*

*W. T. Talbott* and *Morton & Woodell,* for plaintiff in error.
*Corley & Greene,* for defendant in error.

LYNCH, PRESIDENT:

On January 23, 1909, Salisbury and Brooks entered into
the agreement out of which this controvery has arisen: Is
it a contract of sale, or a contract of agency to sell the lum-
ber manufactured from timber on lands owned and con-
trolled by Salisbury in Webster county? The answer to that
question virtually determines the issues between the parties.
Construing it as a contract of sale, the trial court overruled
the demurrer to the evidence interposed by defendant, after
each party had introduced his proof before the jury, and
entered judgment for plaintiff upon the conditional verdict.

The declaration, demurred to and held sufficient, contains
the common counts, and a special count in assumpsit based
upon the contract. No defect in the pleading is pointed out,
and none is perceived. The trial had upon the usual joinder
on the non-assumpsit plea, the bill of particulars filed with
the declaration and specification of sets-off filed with the plea,
resulted in a verdict for plaintiff in the sum of $249.86 if
the law be for him, and for defendant in the sum of $150.44
if the law be for him.

The material provisions of the contract, upon the true in-
terpretation of which a decision upon the merits of the con-
troversy depends, are: "In consideration of one dollar in
hand and other considerations, the said Salisbury hereby sells
to Arthur Brooks all the lumber to be cut from a certain tract
of timber owned by him", estimated "at about 3,000,000 feet.
Said Salisbury is to cut, cure properly, and load on car as
sales can be made.

"Said Brooks shall market the lumber to the best ad-
vantage, and pay to Salisbury all money he shall receive for
said lumber except one dollar per M on lumber bringing not
over $15.00 per M and on car stock, and on lumber over
$15.00 per M two dollars per M.

"Said Brooks is to advance on said lumber to pay manu-
facturing expenses the money necessary, estimated at about
$1,500 (about $500 each month), no interest to be charged,
the one or two dollars per M mentioned above to be in pay-

ment for use of the money and for Brooks' services in sell-
ing the lumber. Said Salisbury is to have a mill ready to run
by March 1, 1909, and to manufacture with due diligence.''

The first paragraph and some provisions of the last one,
dissociated from other coordinate and equally significant pro-
visions, may, when cursorily read and considered together, in-
duce the belief that the parties intended the contract to
create the relation of vendor and purchaser. They purport
to sell lumber, for the manufacture of which from certain
timber owned by one of them the other was to advance by
monthly payments, without interest, the estimated sum of
money to defray expenses necessary to put into deliverable
condition for market the lumber with which the contract
purports to deal. Evidently it was this severance of the
various stipulations that led to the conclusion by which the
jury was guided in its deliberations. If so, that method
finds no support in any competent authority. The well rec-
ognized canons or rules of construction and interpretation
of instruments require consideration and comparison of every
coordinate provision of the paper whose true intent and
meaning is to be ascertained. 1 Clark & Skyles on Agency
16; 1 Mechem on Agency 29.

Taking the contract by its four corners, as the authorities
say we must, and looking into all of its stipulations and
covenants, it seems clear that a misconception of the actual
intent and purpose of the instrument led to the judgment
based upon the verdict. This conclusion finds lodgment in
the requirement to cut, cure and load the lumber as sales are
made; to market the lumber to the best advantage, and pay
to Salisbury the money received from sales, Brooks to retain
either one or two dollars per thousand feet as compensation
in lieu of interest on the advancements and for his services
in selling the lumber. It is difficult to understand or appre-
ciate the necessity or presence of these mutual requirements
and obligations on any theory other than that of a contract
of agency. Salisbury was to furnish the mill and put the
timber owned by him into a marketable condition in the form
of lumber, Brooks was to furnish the funds necessary for that
purpose, sell the manufactured product, and account therefor

to Salisbury upon the specific terms of the agreement, less the compensation fixed by the parties in lieu of interest on the money advanced and for services as agent. These requirements and stipulations are inconsistent with any other conception of the contract. If it constitutes an agreement to sell, they are meaningless. But they can not be ignored. They were placed there for some purpose, doubtless as the result of definite antecedent negotiations therefor, consummated by the final written expression of the agreement.

The term "sells", used in the first paragraph, does not necessarily indicate an intention to pass title when the lumber was in a marketable condition. Other provisions clearly restrict its meaning, and explain the real scope and purpose to be effected by the agreement. Not what a contract is named or described to be, nor any one of numerous inconsistent phrases or paragraphs, but what is its true nature and effect as a whole, determines its real character. 1 Mechem on Sales §46; *Heryford* v. *Davis*, 102 U. S. 235; *Sturm* v. *Boker*, 150 U. S. 312; see also *Barnes* v. *Bloch Brothers*, 38 W. Va. 163. Though described to be a lease, a contract very similar to the one here involved was held to create an agency, in *Pettenay* v. *McIntire*, 131 N. C. 432, 442. "Provisions of a contract which without explanation might indicate or import a purchase and sale will not be conclusive of that fact, if they are not inconsistent with an agency and an agency is made out by other parts of the contract or by extraneous evidence of the understanding of the parties". 1 Clark & Skyles on Agency 24.

The difficulty in distinguishing between contracts of sale and the creation of an agency to sell has led to the establishment of rules by the application of which this difficulty may be solved. The decisions say the transfer of title or agreement to transfer it for a price paid or promised is the essence of a sale. If such transfer puts the transferee in the attitude or position of an owner, and makes him liable to the transferor as a debtor for the agreed price, and not merely as an agent who must account for the proceeds of a resale, the transaction is a sale; while the essence of an agency to sell is the delivery to an agent, not as his property, but as

the property of the principal, who remains the owner and
has the right to control sales, fix the price and terms, demand
and receive the proceeds less the agent's commission upon
sales made. 1 Mechem on Sales §43; 1 Mechem on Agency
§48; Williston on Sales 1; Tiedeman on Sales 1. Tested by
these principles, the contract, read and considered as a whole,
did not operate to transfer title or confer ownership on
Brooks, but rather created the relation of an agency to sell
and account for the proceeds. The parties fixed an average
sale price for the lumber, presumably the market price at
that time; and, as an inducement to obtain an amount in ex-
cess of that sum, the rate of commission to be reserved by
Brooks in an accounting between him and Salisbury was in-
creased above that for sales made at a less sum. Why, if
by the contract Brooks became owner of each shipment of
lumber, should Salisbury be solicitous about commissions, or
even negotiate regarding their deduction from the proceeds?
It could not matter to him whether sales were made at a
profit or at a loss, if he had parted with the title. What was
received would not in that event concern him. He would
get no more and no less, whatever Brooks sold for. Or why
the necessity for an accounting, such as the parties evidently
contemplated? They provided for a settlement of all trans-
actions in anywise regarding the lumber. All that was re-
ceived by Brooks was to be paid to Salisbury, less commis-
sions, which covered interest on the money advanced and
compensation for services in making sales. These conditions
are inconsistent with the conception of an intention to trans-
fer title.

But defendant in error says the parties have by their deal-
ings as regards the contract placed upon it their own inter-
pretation as one of sale, and not as one creating an agency.
Salisbury sold some of the lumber, and upon demand for
payment acknowledged the departure from the terms of the
agreement and delivered or promised to deliver the proceeds
to Brooks; and Brooks shipped and sold the lumber in his
own name, and in a bankruptcy proceeding proved against
the bankrupt a claim for a balance due on a shipment to

him, and accepted a pro rata distribution for such balance. Resort to this mode of ascertaining what a writing was intended to accomplish or express is allowed only where its meaning is doubtful or its terms ambiguous, and not other-wise. The writing speaks its own meaning when there is no ambiguity or uncertainty. *Hurst* v. *Hurst,* 7 W. Va. 299; *Crislip* v. *Cain,* 19 W. Va. 483; *Camden* v *McCoy,* 48 W. Va. 377; *Hall Mining Co.* v. *Consolidated Fuel Co.,* 69 W. Va. 47; *Myers* v. *Carnahan,* 61 W. Va. 414; *Lovett* v. *Central Gas Co.,* 73 W. Va. 40. But conceding the applicability of the rule contended for, the variance or departure from the expressed terms of the compact does not necessarily warrant an interpretation adverse to that we have placed upon it. Such acts prove nothing more than that Salisbury sold lumber the sale of which he had entrusted to Brooks, and that Brooks was entitled to it as a credit on the unpaid balance of the sum advanced to defray the expenses incident to the manufacture of the lumber; and certainly the shipments to purchasers procured through the agency of Brooks, in his name, was clearly within the actual contemplation of the agreement, or, if not, it did with sufficient clearness indicate an intention to empower Brooks to collect the proceeds of such sales.

Other questions become immaterial and unimportant in view of these conclusions. Wherefore, we reverse the judgment of the circuit court, and enter judgment here for defendant for the sum of $150.44, the amount returned by the verdict should the law on the demurrer be for him, and we have so found it.

*Reversed and judgment entered for defendant.*